UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

C&A CARBONE, INC., SCUFFY CARTING, INC.,
PROVENZA CONTRACTING, INC., MR. J. JR.
EXCAVATING, INC., and MICHAEL RICKLI, JR.,

                Plaintiffs,

     -v-

THE COUNTY OF ROCKLAND, LEGISLATURE
OF THE COUNTY OF ROCKLAND, ROCKLAND
COUNTY SOLID WASTE MANAGEMENT
AUTHORITY, C. SCOTT VANDERHOEF,
individually and as Rockland County Executive,
CHRISTOPHER P. ST. LAWRENCE, individually
and as Chairman of the Rockland County Solid Waste
Management Authority, THE TOWN OF
CLARKSTOWN, TOWN BOARD OF THE TOWN
OF CLARKSTOWN, ALEXANDER J. GROMACK,
individually and as Supervisor of the Town of
Clarkstown, and CLARKSTOWN RECYCLING
CENTER, INC.,

                Defendants.

Case No. 08-CV-6459 (KMK)

OPINION AND ORDER

Appearances:

Dennis E. A. Lynch, Esq.
Feerick, Lynch & MacCartney
South Nyack, NY
*Counsel for Plaintiff*s

Richard A. Glickel, Esq.
West Nyack, NY
*Counsel for Defendant*s *The Town of Clarkstown, Town Board of the Town of Clarkstown, and Alexander J. Gromack*

Donald Samuel Tracy, Esq.
Tracy & Edwards
New City, NY
*Counsel for Defendant Clarkstown Recycling Center, Inc.*

KENNETH M. KARAS, District Judge:

Plaintiffs C&A Carbone, Inc. ("Carbone"), Scuffy Carting, Inc. ("Scuffy"), and Provenza Contracting, Inc. ("Provenza"), bring this suit against the County of Rockland ("Rockland"), the Legislature of the County of Rockland, the Rockland Solid Waste Management Authority ("the Authority"), C. Scott Vanderhoef, individually and as Rockland County Executive, and Christopher St. Lawrence, individually and as Chairman of the Authority (collectively, "the Rockland Defendants").  Plaintiffs also sue the Town of Clarkstown ("Clarkstown"), the Town Board of the Town of Clarkstown, and Alexander J. Gromack, individually and as Supervisor of Clarkstown (collectively, "the Clarkstown Defendants").  Plaintiffs have further named the Clarkstown Recycling Center, Inc. ("CRC"), a private waste management company, as a defendant.  Plaintiffs sue under 42 U.S.C. §§ 1983 ("§ 1983") and 1985(3) ("§ 1985(3)"), for violations of the Commerce, Takings, Due Process, and Equal Protection clauses of the U.S. Constitution.  Plaintiffs also allege that Defendants violated New York's State Environmental Quality Review Act ("SEQRA"), N.Y. Comp. Codes R. & Regs. tit. 6, § 617.3 *et seq*.  The Clarkstown Defendants and CRC have moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).[1]  For the following reasons, those motions are granted in part and denied in part.

---

[1] Unlike the Clarkstown Defendants who moved for judgment on the pleadings (Dkt. No. 38), CRC moved to dismiss under Fed. R. Civ. P. 12(b)(6), (Dkt. No. 43).  Because CRC has already filed an answer (Dkt. No. 21), the Court construes its motion as a motion for judgment on the pleadings.  *Compare* Fed. R. Civ. P. 12(b)(6) ("A motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed."), *with id.* 12(c) ("After the pleadings are closed--but early enough not to delay trial--a party may move for judgment on the pleadings.").

I.  Background

A.  Facts

This suit is the most recent skirmish in a longstanding dispute between two competing waste-processing companies in Clarkstown, NY:  Carbone and CRC.  *See C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383 (1994) ("*Carbone I*").  The town of Clarkstown lies in New York's Hudson River Valley, just upstream from the Tappan Zee Bridge and minutes from New Jersey by highway.  *Carbone I*, 511 U.S. at 386.  In 1989, Clarkstown decided to build a new solid waste transfer station.  *Id.* at 387.  The station would receive bulk solid waste and separate recyclable from nonrecyclable items.  *Id.*  Recyclable waste would be baled for shipment to a recycling facility; nonrecyclable waste, to a suitable landfill or incinerator.  *Id.*  The cost of building the transfer station was estimated at $1.4 million.  *Id.*  CRC agreed to construct the facility at no charge, operate it for five years, and then sell it to the town for one dollar.  *Id.*; (Am. Compl. ¶ 20.)  In exchange, the town guaranteed that, during those five years, CRC would receive a minimum waste flow of 120,000 tons per year, for which it could charge the hauler a "tipping fee" of $81 per ton.  *Carbone I*, 511 U.S. at 386; (Am. Compl. ¶ 20.)[2]  In order to make good on that guarantee, Clarkstown adopted Local Laws 1990, No. 9 of the Town of Clarkstown[3], which required, under criminal penalty, all nonhazardous solid waste within the town to be deposited at CRC's transfer station ("the CRC facility").  *Carbone I*, 511 U.S. at 386; (Am. Compl. ¶ 21.)

---

[2] If the station received less than 120,000 tons in a year, Clarkstown committed to make up the deficit in tipping fees.  *See Carbone I*, 511 U.S. at 387.

[3] Plaintiffs refer to the "1991 Flow Control Law" throughout their Amended Complaint, but appear to be discussing Locals Law 1990, No. 9 of the Town of Clarkstown.  *See Carbone I*, 511 U.S. at 387, 395.  The Court will refer to this ordinance as "the 1990 Flow Control Law."

Carbone is CRC's chief competitor. *Carbone I*, 511 U.S. at 388. It too operates a recycling center in Clarkstown where it receives solid waste, sorts and bales it, and then ships it to other processing facilities. *Id.* at 387-88. While the 1990 Flow Control Law permitted companies like Carbone to continue receiving solid waste, it required them to bring all nonrecyclable residue from that waste to the CRC facility. *Id.* It thus prohibited Carbone from shipping the nonrecyclable waste itself, and required Carbone to pay a tipping fee to CRC on trash it already sorted. *Id.*; (Am. Compl. ¶ 21.)

In 1994, the Supreme Court struck down the ordinance under the dormant Commerce Clause, finding that it "hoard[ed] solid waste, and the demand to get rid of it, for the benefit of the preferred processing facility." *Carbone I*, 511 U.S. at 392. The law thus "discriminate[d] against interstate commerce" by prohibiting patronage of out-of-state waste-processing facilities. *Id.* at 390. Therefore, the Supreme Court concluded that "the flow control ordinance is just one more instance of local processing requirements that [the Court] long ha[s] held invalid." *Id.* at 391.

On June 5, 1996, in the wake of the Supreme Court's ruling, Carbone and Clarkstown settled the dispute. (Am. Compl. ¶ 28.) The Town agreed to pay Carbone $25,000 per year for twenty years (or until Clarkstown built a road providing direct access from the CRC facility to Carbone's facility). (*Id.*) Clarkstown also agreed to update its zoning laws to authorize Carbone's facility to perform all activities which the CRC facility was authorized to perform. (*Id.*) By that time, Clarkstown had bought the CRC facility, although CRC continues to operate it. (*Id.*)[4] The two facilities have competed in the waste-processing market since then. (*Id.* ¶ 29.)

---

[4] The Court will continue to refer to this facility, which CRC built and continues to operate, as "the CRC facility," even though it was sold to Clarkstown in 1996, and then to the Authority in 2008.

4

According to the Amended Complaint, Carbone has greatly outperformed its rival.  (*Id.* ¶¶ 30-36.)  Specifically, Carbone claims that its facility captures four times as much recyclable material from its waste as the CRC facility does.  (*Id.* ¶ 30.)  This increased efficiency allegedly benefits the environment and increases Carbone's revenue by providing it with more recyclable material to sell.  (*Id.*)  Carbone asserts that it then passes this efficiency on to the consumer in the form of lower tipping fees.  (*Id.*)  Carbone further alleges that, although its facility boasts a safety record that is superior to the CRC facility's (*id.* ¶¶ 31-35), Clarkstown and Rockland ignore the CRC facility's safety violations (*id.* ¶ 35), and selectively enforce environmental ordinances against Carbone, (*id.* ¶ 37).  In short, despite the Supreme Court's ruling in *Carbone I* and the 1996 settlement, Carbone claims that Clarkstown continues to favor the CRC facility over Carbone's.  (*Id.* ¶ 35.)

    In 2008, Rockland, in which Clarkstown is located, adopted Local Law No. 2 of 2008 ("the 2008 Flow Control Law").  (*Id.* ¶ 41.)  The law requires that all solid waste generated within the county be processed at one of the facilities designated by the Authority.  (*Id.* ¶¶ 41-49.)[5]  All facilities that are not so designated are thus barred from competing for the solid waste generated in Rockland and the accompanying tipping fee.  (*Id.* ¶ 61.)  In passing the 2008 Flow Control Law, Rockland effectively amended its 1991 solid waste management plan, which had been approved by the New York State Department of Environmental Conservation ("DEC").  (*Id.* ¶¶ 23-24, 53.)  The 1991 plan allegedly did not find flow control laws necessary, nor did the accompanying environmental impact statement.  (*Id.* ¶23.)  The DEC allegedly did not review or approve the 2008 Flow Control Law.  (*Id.* ¶¶ 53-54, 59.)

_____

[5] The 2008 Flow Control Law applies to "household waste, commercial waste, recyclables, construction and demolition debris, and yard waste."  (Am. Compl. ¶ 41.)

The Authority allegedly has "unfettered discretion" to decide which waste-processing stations to "designat[e]," and thereby could award a monopoly to a designated facility. (*Id.* ¶¶ 59-60.) "Under the 2008 Flow Control Law, a 'designated facility' is 'any publically owned solid waste facility(ies) and/or any solid waste facility(ies) owned and/or operated by the [A]uthority, and designated by the [A]uthority for acceptance or disposal of [] waste . . . .'" (*Id.* ¶ 49.) In choosing a facility to purchase or designate, the Authority allegedly does not employ a bidding process, evaluative criteria, or award standards. (*Id.* ¶ 60.) The Authority allegedly has not solicited proposals from facilities that might be interested in being an Authority-designated facility (*id.*), nor has it investigated its designated facilities or analyzed their environmental record, (*id.* ¶ 59). Carbone's facility, which has allegedly been disfavored since *Carbone I*, was not designated (*id.* ¶ 52), while the CRC facility, which has allegedly been favored since *Carbone I*, was designated, (*id.* ¶¶ 60, 68-72).[6]

The CRC facility allegedly was designated as the result of a deal entered into in or around November 2008 between several Defendants: the Authority, Clarkstown, and CRC (the "November 2008 Deal"). (*Id.* ¶¶ 56-60, 68-70, 101.)[7] In this deal, the Authority agreed to purchase the CRC facility from Clarkstown, presumably for the purpose of "designati[ng]" the facility. (*Id.* ¶¶ 57, 60, 68.) Upon the sale of the CRC facility from Clarkstown to the Authority, the Authority, in turn, has or will contract with CRC to continue to operate the CRC facility for a

_____

[6] Before the 2008 Flow Control Law, Carbone received roughly one-third of its in-bound waste from Rockland. (Am. Compl. ¶ 62.) By directing this waste to Carbone's competitor, Defendants have allegedly effectively "legislat[ed] Carbone out of business." (*Id.*) Plaintiffs believe this was Defendants' purpose. (*Id.* ¶¶ 63-64.)

[7] The Complaint, amended on November 12, 2008 (Dkt. No. 3), alleged that this deal would be consummated in or around November 2008, (Am. Compl. ¶ 68). At oral argument, Plaintiffs' counsel indicated that the deal has since been completed.

five-year term, renewable every five years for up to twenty-five years.  (*Id.* ¶¶ 68, 70, 72.)

According to Plaintiffs, the decision to purchase the CRC facility and to contract with CRC to

operate it "was not the product of competitive bidding" or the application of "evaluative

criteria."  (*Id.* ¶ 69.)  The supposed result of the November 2008 Deal is that the 2008 Flow

Control Law, as applied, will monopolize the trash-processing industry in favor of a facility

which is publically-owned, but operated by a private company pursuant to a twenty-five year,

no-bid contract.  (*Id.* ¶¶ 69-71.)[8]

### B.  Procedural History

Plaintiffs filed this suit on July 18, 2008, and amended the Complaint on November 12,

2008.  (Dkt. Nos. 1, 3.)[9]  The Clarkstown Defendants moved for judgment on the pleadings on

September 29, 2009, and CRC moved to dismiss on October 1, 2009.  (Dkt. Nos. 38, 43.)  The

Court held oral argument on July 1, 2010.  (Dkt. No. 47.)  Notably, the Rockland Defendants

have not moved to dismiss this suit.

## II.  Discussion

### A.  Standard of Review

"On a Rule 12(b)(6) motion to dismiss a complaint, the court must accept a plaintiff's

factual allegations as true and draw all reasonable inferences in [the plaintiff's] favor."  *Gonzalez*

*v. Caballero*, 572 F. Supp. 2d 463, 466 (S.D.N.Y. 2008); *see also Ruotolo v. City of New York*,

514 F.3d 184, 188 (2d Cir. 2008) ("We review *de novo* a district court's dismissal of a complaint

---

[8] The Authority allegedly has also purchased another facility in West Haverstraw, NY, and awarded a no-bid contract to another private company for its operation.  (Am. Compl. ¶¶ 66-67.)

[9] Besides Carbone, the other plaintiffs are Scuffy, a New Jersey corporation which has a contract with the Village of Suffern, which is in Rockland, to pick up solid waste from Suffern and delivery it to Carbone (Am. Compl. ¶ 5), and Provenza, a Rockland construction company which, as such, makes significant use of solid waste-processing services, (*id.* ¶ 3).

pursuant to Rule 12(b)(6), accepting all factual allegations in the complaint and drawing all reasonable inferences in the plaintiff's favor." (internal quotation marks omitted)).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and internal citations omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level," *id.*, and "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563.

Simply put, Plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570.  If Plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed."  *Id.*; *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009) ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.'" (alteration in original) (internal citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))).  The standard of review for a Rule 12(c) motion for judgment on the pleadings is the same as the standard of review for a Rule 12(b)(6) motion to dismiss for failure to state a claim.  *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006).

B.  Analysis

The Clarkstown Defendants and CRC seek to be dismissed from this suit because nothing in the Amended Complaint asserts that they "had anything to do with enacting . . . the 2008 Flow

Control Law," as that law was passed solely by the Rockland County legislature, without the "participat[ion]" or "involve[ment]" of the Clarkstown Defendants and CRC.  (Mem. of Law in Supp. of the Clarkstown Defs.' Mot. for a J. Dismissing the Am. Compl. ("Clarkstown Defs.' Mem.") 8; Mot. to Dismiss for Failure to State a Claim ("CRC Mem.") 1-2.)  Thus, even assuming *arguendo* that the 2008 Flow Control Law violates the dormant Commerce Clause, the Clarkstown Defendants and CRC argue that Plaintiffs have still "fail[ed] to sufficiently plead [their] involvement in any conspiracy" to inflict this unconstitutional harm.  (Clarkstown Defs.' Mem. 6.)

### 1.  Commerce Clause Claim

Count I of the Amended Complaint alleges that by providing a monopoly to a single local waste management firm, the 2008 Flow Control Law, as implemented, discriminates against interstate commerce in violation of the dormant aspect of the Commerce Clause.  (Am. Compl. ¶¶ 92-101.)  The Commerce Clause provides that "Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const., Art. I, § 8, cl. 3.  Although the clause does not explicitly limit the power of the states to regulate commerce, the Supreme Court has "long interpreted the Commerce Clause as an implicit restraint on state authority, even in the absence of a conflicting federal statute." *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007) (citing *Case of the State Freight Tax*, 82 U.S. (15 Wall.) 232, 279 (1873), and *Cooley v. Bd. of Wardens ex rel. Soc'y for Relief of Distressed Pilots*, 53 U.S. (12 How.) 299, 318 (1852)); *see also SSC Corp. v. Town of Smithtown*, 66 F.3d 502, 509 (2d Cir. 1995) ("[F]ederal courts have for more than 150 years invoked the Commerce Clause to scrutinize state regulations affecting interstate commerce.").

The Supreme Court has long held that local processing requirements, i.e., mandates that certain services be performed locally, discriminate against out-of-state providers of those services. *See S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82 (1984) (striking down an Alaska regulation that required all Alaska timber to be processed within the state prior to export); *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) (striking down Arizona statute that required all Arizona-grown cantaloupes to be packaged within the state prior to export); *Toomer v. Witsell*, 334 U.S. 385 (1948) (striking down South Carolina statute that required shrimp fishermen to unload, pack, and stamp their catch in South Carolina before shipping it to another state); *Foster-Fountain Packing Co. v. Haydel*, 278 U.S. 1 (1928) (striking down a Louisiana statute that forbade shrimp to be exported unless the heads and hulls had first been removed within the state); *Johnson v. Haydel*, 278 U.S. 16 (1928) (striking down analogous Louisiana statute for oysters); *Minnesota v. Barber*, 136 U.S. 313 (1890) (striking down a Minnesota statute that required animals to be examined by an inspector within the state before slaughtering for any meat sold within the state). "The essential vice in laws of this sort is that they bar the import of the processing service," depriving out-of-state vendors and businesses of the "local demand for their services." *Carbone I*, 511 U.S. at 392.

In *Carbone I*, the Supreme Court found that Clarkstown's 1990 Flow Control Law was "just one more instance of local processing requirements that we long have held invalid." *Id.* at 391. Accordingly, the Court ruled that the ordinance "discriminate[d] against interstate commerce," *id.* at 390, by "hoard[ing] solid waste, and the demand to get rid of it, for the benefit of the preferred processing facility," *id.* at 392, and "prohibiting patronage of out-of-state [waste-processing] competitors," *id.* at 394. The Court also noted that the "only conceivable distinction from" the other local processing cases "is that the flow control ordinance favors a

10

single local proprietor." *Id.* at 392. "But," the Court insisted, "this difference just makes the protectionist effect of the ordinance more acute." *Id.*; *see also id.* at 391 ("The ordinance is no less discriminatory because in-state or in-town processors are also covered by the prohibition.").

But, in *United Haulers*, the Supreme Court upheld flow control ordinances that were "quite similar to the one invalidated in" *Carbone I. United Haulers*, 550 U.S. at 334. In fact, "[t]he only salient difference is that the laws at issue [in *United Haulers*] require[d] haulers to bring waste to facilities owned and operated by a state-created public benefit corporation," rather than to a "private processing facility." *Id.* In their motion papers, the Clarkstown Defendants and CRC do not argue that the 2008 Flow Control Law does not violate the dormant Commerce Clause as interpreted by *Carbone I* and *United Haulers*. Instead, the Clarkstown Defendants and CRC seek to avoid liability for the allegedly unconstitutional law on the ground that the Amended Complaint does not allege that they had anything to do with the Rockland County legislature passing the 2008 Flow Control Law. (Clarkstown Defs.' Mem. 8; CRC Mem. 1-2.)

Defendants' motions are thus based, in large part, on the premise that Plaintiffs only allege that the 2008 Flow Control Law is unconstitutional on its face. But the 2008 Flow Control Law is not unconstitutional on its face. Indeed, the Authority might have only designated publicly-owned and operated facilities, thereby bringing the law squarely within the *United Haulers* exception. Instead, the alleged constitutional violation is derived from the November 2008 Deal in which the Authority, the Clarkstown Defendants, and CRC purportedly agreed to funnel the monopoly created by the 2008 Flow Control Law to a private company. The Amended Complaint, properly construed, thus alleges a conspiracy, between the Authority,

11

Clarkstown, and CRC to implement the 2008 Flow Control Law in a way that would create an

unconstitutional end run around *Carbone I*.[10]

### 2.  Section 1983 Analysis

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or

more state actors or between a state actor and a private entity; (2) to act in concert to inflict an

unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."

*Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999).[11]  Conclusory allegations of a § 1983

---

[10] The Clarkstown Defendants focus on the Amended Complaint's statement that "[t]his is an action to declare unconstitutional and otherwise illegal the Rockland County Flow Control Law . . . *on its face*, in purpose and in effect," apparently believing that this precludes the Court from considering whether the law is unconstitutional as applied.  (Clarkstown Defs.' Mem. 3 n.4 (quoting Am. Compl. ¶ 1) (emphasis in Clarkstown Defs.' Mem.).)  But several other portions of the Amended Complaint indicate that Plaintiffs also challenge the 2008 Flow Control Law as unconstitutional as applied.  (Am. Compl. ¶ 1 ("By virtue of arrangements the Authority has entered into, the Law impermissibly affords economic protectionism and thwarts economic competition."); *id.* ¶¶ 56-57 ("[T]he Defendants are conspiring to again bestow on Clarkstown Recycling Center, Inc. a government-guaranteed monopoly. . . . The Authority has agreed to purchase the Town of Clarkstown's transfer station and Clarkstown Recycling Center, Inc. will operate the transfer station.").)  Accordingly, the Court reads the Complaint as also challenging the 2008 Flow Control Law as applied via the November 2008 Deal.  *See Alexander v. Unification Church of Am.*, 634 F.2d 673, 678 (2d Cir. 1980) ("It is not material, under the liberal rules of federal pleading, that Count One was mislabelled by appellants' counsel."), *abrogated on other grounds by Curiano v. Suozzi*, 469 N.E.2d 1324 (N.Y. 1984); 5 Wright & Miller, *Federal Practice & Procedure* § 1286 (3d ed.) (noting that a "district court is obligated to make a determined effort to understand what the pleader is attempting to set forth," to "construe the pleading in his or her favor," and "to give effect to all its averments").

[11] Plaintiffs also assert claims under § 1985(3).  (Am. Compl. ¶ 101.)  These claims fail because Plaintiffs do not allege that they have suffered from any racial or other class-based animus.  *See Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971) (holding that, in order to state a claim under § 1985(3), "there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action"); *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d Cir. 2007) ("A § 1985(3) conspiracy must also be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." (internal quotation marks omitted)); *Gleason v. McBride*, 869 F.2d 688, 694-95 (2d Cir. 1989) (holding that, in order to state a § 1985 claim, a plaintiff must "allege that he was a member of a protected class, that the defendants conspired to deprive him of his constitutional rights, that the defendants acted with class-based, invidiously discriminatory

conspiracy are insufficient.  *See Ciambriello v. County of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002).  Instead, the complaint must contain "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556.  Still, the Second Circuit has observed that "[w]hile conclusory allegations of a § 1983 conspiracy are insufficient, we have recognized that such conspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence." *Pangburn*, 200 F.3d at 72 (internal quotation marks and citations omitted).  And the Supreme Court has stressed that "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556.  In fact, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id.* (internal quotation marks omitted).

Here, Plaintiffs allege that CRC became an Authority-designated facility as the result of an illegal deal between the Authority, Clarkstown, and CRC.  (Am. Compl. ¶¶ 56-60, 68-70, 101.)  In this November 2008 Deal, the Authority allegedly agreed to purchase the CRC facility from Clarkstown, presumably for the purpose of "designati[ng]" the facility.  (*Id.* ¶¶ 57, 60, 68.)  According to the Amended Complaint, the Authority, in turn, has or will contract with CRC to continue to operate the CRC facility for a five-year term, renewable every five years for up to twenty-five years.  (*Id.* ¶¶ 68, 70, 72.)  The decision to purchase the CRC facility and to contract with CRC to operate it, purportedly "was not the product of competitive bidding" or the application of "evaluative criteria."  (*Id.* ¶ 69.)

---

animus, and that he suffered damages as a result of the defendants' actions").

Clarkstown and CRC's defense appears to be they did not intend to entrench CRC as a monopoly waste management operator.  Rather, Clarkstown simply sold the CRC facility to Rockland because it offered a good price.  And it was the Authority's decision to enter into an operation contract with CRC.  (*Id.* ¶ 68.)  Clarkstown, however, allegedly has a history of attempting to bestow monopoly benefits on CRC.  (*Id.* ¶¶ 20-39.)  And it is plausible that the Authority, through Clarkstown, did not just happen to award a lucrative, no-bid contract to CRC, a firm that Clarkstown has allegedly favored and "entrenched" as a waste-processing operator "for almost [twenty] years."  (*Id.* ¶¶ 60, 69, 72.)  Accordingly, there is at least "a reasonable expectation that discovery will reveal evidence of illegal agreement."  *Twombly*, 550 U.S. at 556; *cf. Pangburn*, 200 F.3d at 72 (noting that, while the "amended complaint obviously could benefit from further amendment, it does sufficiently allege a § 1983 conspiracy").   The alleged November 2008 Deal thus constitutes "an agreement . . . to act in concert to inflict an unconstitutional injury," and the execution of that deal is "an overt act done in furtherance of that goal causing damages," sufficient to state a conspiracy to violate the Constitution under § 1983.  *Pangburn*, 200 F.3d at 72.

The Clarkstown Defendants maintain that Carbone is not worse off because of the November 2008 Deal, since, either way, the 2008 Flow Control Law would have prevented Carbone from competing for Rockland County trash.  (Clarkstown Defs.' Mem. 8.)  That is, the 2008 Flow Control Law would have banned Carbone from receiving Rockland waste regardless of whether the Clarkstown Defendants sold the CRC facility to the Authority, thus exempting that facility and its operator, CRC, from the law's prohibition.  This argument misses the point of the prohibition of discrimination against interstate commerce.  While Carbone does not have a right to compete free from flow control laws, it does have a right to be treated the same as every

other private business with respect to flow control laws. *See United Haulers*, 550 U.S. at 342

(noting that the flow control laws at issue did not discriminate against interstate commerce

because they "benefit a clearly public facility, while treating all private companies *exactly the*

*same*" (emphasis added)).  Accordingly, even if the Commerce Clause was not violated when the

2008 Flow Control Law prohibited Carbone from competing for Rockland's waste, it may have

been violated when the November 2008 Deal effectively exempted Carbone's rival from that

prohibition.

Nor does CRC's status as a private entity immunize it from § 1983 liability.  "[T]o act

'under color of' state law for § 1983 purposes does not require that the defendant be an officer of

the State.  It is enough that he is a willful participant in joint action with the State or its agents."

*Dennis v. Sparks*, 449 U.S. 24, 27 (1980); s*ee also Adickes v. S. H. Kress & Co.*, 398 U.S. 144,

152 (1970) ("To act 'under color' of law does not require that the accused be an officer of the

State.  It is enough that he is a willful participant in joint activity with the State or its agents."

(internal quotation marks omitted)); *Ciambriello*, 292 F.3d at 324-25 (noting that private actors

can be liable under § 1983 if they conspire or act in concert with public actors).   Again, from the

facts alleged in the Amended Complaint (assuming that they are true), it is at least plausible to

infer that CRC willfully participated in a scheme designed to circumvent the Commerce Clause

by entrenching itself as a monopoly waste management operator.  Accordingly, the motions of

the Clarkstown Defendants and CRC for judgment on the pleadings are denied as to Count I.

### 3.  SEQRA Claim

Count III of the Complaint alleges that the 2008 Flow Control Law was adopted in violation of SEQRA.  (Am. Compl. ¶¶ 107-112.)[12]  Yet, in order to have standing to sue under a New York statute, "a petitioner's injury [must] fall within the concerns the Legislature sought to advance or protect by the statute."  *Soc'y of Plastics Indus., Inc. v. County of Suffolk*, 573 N.E.2d 1034, 1041 (N.Y. 1991).  This requirement is "particularly meaningful in SEQRA litigation, where challenges unrelated to environmental concerns can generate interminable delay and interference with crucial governmental projects."  *Id.*  The New York Court of Appeals has therefore "recognized the danger of allowing special interest groups or pressure groups, motivated by economic self-interests, to misuse SEQRA for such purposes."  *Id.*  Accordingly, "[i]n order to demonstrate standing to raise a SEQRA challenge," a plaintiff must suffer harm that "falls within the 'zone of interests' sought to be promoted or protected by the statute." *Bridon Realty Co. v. Town Bd. of Town of Clarkstown*, 672 N.Y.S.2d 887, 888 (App. Div. 1998). "Since the zone of interests, or concerns, of SEQRA encompasses the impact of agency action on the relationship between the citizens of this State and their environment, the petitioners must demonstrate a potential injury which is environmental and not solely economic in nature."  *Id.* (internal quotation marks omitted); *see also Soc'y of Plastics Indus.*, 573 N.E. 2d at 1043 ("Clearly, the zone of interests, or concerns, of SEQRA encompasses the impact of agency action on the relationship between the citizens of this State and their environment.  Only those

---

[12] Count II alleges that Defendants' actions constituted an unconstitutional taking of property without due process or just compensation, impaired the obligation of contracts, and denied Plaintiffs the equal protection of the laws.  (Am. Compl. ¶¶ 102-06.)  Although the Clarkstown Defendants and CRC moved to dismiss the entire Amended Complaint as against them (Clarkstown Defs.' Mem. 1-2; CRC Mem. 1), they did not specifically address Count II in their motion papers.  Instead, their supporting papers only address the supposed deficiencies in Counts I and III.  Thus, the Court has not considered whether Count II should be dismissed.

who can demonstrate legally cognizable injury to that relationship can challenge administrative action under SEQRA.").

Here, as pled in the Amended Complaint, Plaintiffs' alleged injuries result from loss of business, not from harm to the environment.  Specifically, Carbone's asserted harm is that it is not able to receive business from and in Rockland County.  As the Amended Complaint put it, Defendants "legislat[ed] Carbone out of business."  (Am. Compl. ¶ 62.)  The other Plaintiffs have allegedly been harmed because the 2008 Flow Control Law does not let them use the purportedly cheaper Carbone facility for their waste-processing needs.  (*Id.* ¶¶ 80-81.)  To be sure, Plaintiffs do insist that the 2008 Flow Control Law is harming the environment.  (*Id.* ¶ 111.)  But, they do not allege that this environmental harm will affect them in any special way.  (*Id.*)  In fact, it appears that Plaintiffs' injuries – which all stem from the loss of the cheaper Carbone station – would be the same even if the CRC facility turns out to be the most environmentally friendly trash-processing facility in the country.  Accordingly, Plaintiffs do not have standing to raise a SEQRA claim.  *See Soc'y of Plastics Indus.*, 573 N.E.2d at 1044 ("[E]conomic injury does not confer standing to sue under SEQRA.  Economic injury is not by itself within SEQRA's zone of interests."); *Bridon Realty Co.*, 672 N.Y.S.2d at 888 ("[A]lthough the petitioners have couched their allegations in terms of potential environmental harm, it is clear that the only special injury they are alleging is a potential economic one, which is not within SEQRA's zone of interests.").  Defendants' motions for judgment on the pleadings as to Count III of the Amended Complaint are therefore granted.

## III.  Conclusion

For the reasons stated herein, the motions of the Clarkstown Defendants and CRC for judgment on the pleadings are denied with respect to the § 1983 claim in Count I, but granted

17

with respect to Count III.  The Clerk of the Court is respectfully directed to terminate the

pending motions.  (Dkt. Nos. 38, 43.)


SO ORDERED.

Dated:          September 30 , 2010
                White Plains, New York

                                                KENNETH M. KARAS
                                                UNITED STATES DISTRICT JUDGE

18

Service List (By ECF)

Dennis E. A. Lynch
Feerick Lynch MacCartney
96 South Broadway
South Nyack, NY 10960
(845) 353-2000
Fax: (845) 353-2789
Email: annmarid@flmpllc.com

Richard A. Glickel
(845)-353-4300
Fax: (845)-353-6221
Email: rglickel@optonline.net

Donald Samuel Tracy
Tracy and Edwards
317 Little Tor Road South
New City, NY 10956
(845)-634-6404
Fax: (845)-634-6538
Email: tracyandedwards@yahoo.com