UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

C&A CARBONE, INC., PROVENZA
CONTRACTING, INC., and NATIONAL SOLID
WASTES MANAGEMENT ASSOCIATION,

                 Plaintiffs,

       - against -

COUNTY OF ROCKLAND, NY, C. SCOTT
VANDERHOEF, solely in his official capacity as
County Executive of the County of Rockland,
ROCKLAND COUNTY SOLID WASTE
MANAGEMENT AUTHORITY, and
CHRISTOPHER P. ST. LAWRENCE, solely in his
official capacity as Chairman of the Rockland County
Solid Waste Management Authority,

                 Defendants.

------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#
DATE FILED: 3/24/14

**<u>OPINION AND ORDER</u>**

08-cv-6459-ER

<u>Ramos, D.J.:</u>

      This case arises out of a longstanding dispute over waste processing and disposal in the

County of Rockland, New York ("Rockland County" or the "County").  It is a dispute that now

spans more than two decades and that has already involved a trip to the Supreme Court.  *See C &*

*A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383 (1994) ("*Carbone I*").  In this latest

installment, plaintiffs C&A Carbone, Inc. ("Carbone"), Provenza Contracting, Inc. and the

National Solid Wastes Management Association (collectively, "Plaintiffs") challenge the

constitutionality of Rockland County's 2008 "flow control"[1] ordinance (the "Rockland Law"),

which directs all solid waste generated within Rockland County to certain designated processing

facilities.  The Rockland Law was adopted after the Supreme Court's decision in *United Haulers*

---

[1] "'Flow control' ordinances require trash haulers to deliver solid waste to a particular waste processing facility."
*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 334 (2007).

*Association, Inc. v. Oneida-Herkimer Solid Waste Management Authority*, 550 U.S. 330 (2007),

and was purposefully drafted so as to conform with the Supreme Court's holding.

The Rockland County Solid Waste Management Authority (the "Authority"), a public

benefit corporation, was tasked with making the designations.  It designated eight publicly

owned facilities, all of which are located within the County.  Plaintiffs allege that, by preventing

non-designated facilities from competing for the business and by denying waste producers and

garbage haulers the ability to send waste to non-designated facilities, including those located in

neighboring states, the County and the Authority have discriminated against—and unduly

burdened—interstate commerce.[2]  Plaintiffs therefore bring suit under 42 U.S.C. § 1983 against

the County, County Executive C. Scott Vanderhoef, the Authority, and Authority Chairman

Christopher P. St. Lawrence (collectively, "Defendants"), alleging violations of the dormant

Commerce Clause.  Doc. 90.[3]  Vanderhoef and St. Lawrence are named solely in their official

capacities.  *Id.*

The parties have filed cross-motions for summary judgment.[4]  Docs. 96, 100.  In

addition, the Institute of Scrap Recycling Industries, the National Association for Information

Destruction and the American Forest & Paper Association (the "*Amici*") have moved for leave to

---

[2] Carbone operates one of the non-designated facilities within Rockland County.  *See* Third Am. Compl. ¶ 34.  The National Solid Wastes Management Association is a national trade association for the solid waste and recycling industry, and Provenza Contracting runs a construction business.  *See id.* ¶¶ 35, 35B.

[3] At its current procedural phase, the action is proceeding under the Third Amended Complaint.  Prior pleadings implicated different parties and additional claims, *see* Docs. 1, 3, but that procedural history is not relevant for purposes of deciding the instant motions and will therefore not be discussed in detail here.

[4] Although Provenza Contracting is still named as a Plaintiff in this case and is represented by the same counsel as the other two Plaintiffs, there is nothing in the motion papers indicating that Provenza has joined Plaintiffs' motion or otherwise remains active in the case.  Given the Court's ruling on the instant motions—and since the Plaintiffs did not assert separate causes of action against Defendants in the Third Amended Complaint—the Court still refers to "Plaintiffs" collectively throughout this Opinion.

appear as *amici curiae* and to submit a brief in support of Plaintiffs' motion.  Doc. 116.

For the reasons discussed below, Plaintiffs' motion for summary judgment is DENIED, and Defendants' motion for summary judgment is GRANTED.  The *Amici*'s motion for leave to appear is GRANTED.

## I.    Factual Background

The following facts are undisputed except where otherwise noted.[5]

In the spring of 2007, the Supreme Court issued its decision in *United Haulers*, upholding flow control laws that were enacted by Oneida and Herkimer Counties in New York (the "Oneida Law" and the "Herkimer Law") (together, the "Oneida-Herkimer Laws").  By the following week, Defendant St. Lawrence was quoted in local Rockland County media, publicly voicing his desire to bring a similar flow control regime to the County.  *See* Certification of Andrew P. Foster (Pls.' MSJ) Ex. 30.[6]  Flow control quickly became the subject of Authority board meetings, and eventually a Flow Control Task Force was established.  *See* Pls.' 56.1 Statement (Pls.' MSJ) ¶¶ 55-56, 61; Defs.' 56.1 Response (Pls.' MSJ) ¶¶ 55-56, 61.  Among the materials reviewed by the Task Force were estimates, prepared by the Authority's consulting engineer, of the impact flow control would have on recycling and disposal rates within the County.  *See* Certification of Andrew P. Foster (Pls.' MSJ) Ex. 149, at RC101611; Pls.' 56.1 Statement (Pls.' MSJ) ¶¶ 71-73; Defs.' 56.1 Response (Pls.' MSJ) ¶¶ 71-73.  The Task Force produced a report in February 2008.  Pls.' 56.1 Statement (Pls.' MSJ) ¶ 74; Defs.' 56.1 Response

---

[5] The parties—particularly Plaintiffs—have compiled an expansive factual record in this case.  The Court provides a broad overview of those facts in this section of the Opinion, with additional facts to be adduced where relevant throughout the balance of the discussion.

[6] For ease of reference, given the voluminous record in this case, citations to the parties' briefs and supporting papers will include a parenthetical notation indicating whether the document was filed in relation to Plaintiffs' or Defendants' motion.

(Pls.' MSJ) ¶ 74.  A public hearing was held during a May 20 meeting of the County legislature.
*See* Certification of Andrew P. Foster (Pls.' MSJ) Ex. 44, at RC98101.  A manager for Plaintiff
National Solid Wastes Management Association was among those who spoke in opposition to,
and expressed concerns about, the proposed flow control ordinance.  *See id.*  The legislature
enacted the Rockland Law at the end of that meeting, and Vanderhoef signed it into law the
following month.  *See id.* at RC98123; Pls.' 56.1 Statement (Pls.' MSJ) ¶ 92; Defs.' 56.1
Response (Pls.' MSJ) ¶ 92.

The Rockland Law mandates that all commercial and residential yard waste, solid waste,
construction and demolition debris, scrap metals and recyclables generated within the County be
delivered to the facility designated by the Authority.  Rockland Law §§ 350-5(A)-(B).[7]  The term
"designated facility" is defined as follows:

> Any publicly owned solid waste facility(ies) and/or any solid waste facility(ies)
> owned and/or operated by the authority, and designated by the authority for
> acceptance or disposal of yard waste, solid waste, construction and demolition
> debris, scrap metals, and/or recyclables, including but not limited to transfer
> stations, materials recovery facilities, drop-off centers, and resource recovery
> facilities.

*Id.* § 350-2.  The law applies to all persons and commercial entities within the County, regardless
of whether they haul their waste directly or utilize the services of a hauler.  *Id.* §§ 350-5(A)-(B).
Violators are subject to civil and administrative penalties.  *Id.* § 350-15.

The Authority designated eights facilities, all of which are publicly owned and located
within Rockland County.[8]  *See* Certification of Andrew P. Foster (Pls.' MSJ) Ex. 19; Pls.' 56.1

---

[7] A copy of the Rockland Law is attached as Exhibit 2 to the Declaration of Peter Adelman in support of
Defendants' motion for summary judgment.  Doc. 98.

[8] As will be discussed *infra* note 20, there is a minor factual dispute over public ownership that is immaterial for
present purposes.

Statement (Pls.' MSJ) ¶¶ 127-28, 131; Defs.' 56.1 Response (Pls.' MSJ) ¶¶ 127-28, 131; Defs.'

56.1 Statement (Defs.' MSJ) ¶ 5; Pls.' 56.1 Response (Defs.' MSJ) ¶ 5.  Those eight designated

facilities are the Clarkstown Transfer Station, the Bowline Transfer Station, the Hillburn

Transfer Station, the Ramapo Yard Waste Compost Facility, the Clarkstown Yard Waste

Compost Facility, the Clarkstown Concrete & Asphalt Crushing Facility, the Materials Recovery

Facility and the French Farms Yard Waste Compost Facility.  Pls.' 56.1 Statement (Pls.' MSJ) ¶

150; Defs.' 56.1 Response (Pls.' MSJ) ¶ 150.[9]

For each facility, the Authority entered into a contractual relationship with a private

company,[10] pursuant to which the contractor assumed responsibility for certain operational

responsibilities at that facility.  *See* Certification of Andrew P. Foster (Pls.' MSJ) Ex. 21, 24, 26,

53, 68, 69, 70.[11]  In general, the contractors were selected via a Request For Proposal (RFP)

process, though in some instances existing contracts were simply assigned to the Authority at the

time it purchased the particular facility.  *See id.* Ex. 48, at 143:22-146:5.

The contractors were typically responsible for general operational and maintenance

duties, including receiving and processing waste, making repairs, staffing the facility, and

maintaining the books and records.  *See, e.g.*, *id.* Ex. 69 at 16-23 (describing the allocation of

operational responsibilities at the Clarkstown Transfer Station).  The Authority retained broad

oversight rights, including the right to access the facilities to inspect and monitor the contractors'

---

[9] In order to make its desired designations, the Authority purchased some of these facilities subsequent to the
Rockland Law's enactment.  *See* Pls.' 56.1 Statement (Pls.' MSJ) ¶ 109; Defs.' 56.1 Response (Pls.' MSJ) ¶ 109.

[10] For facilities that were Authority-owned prior to enactment of the Rockland Law, the applicable contracts were
already in place by the time flow control was enacted.  *See* Certification of Andrew P. Foster (Pls.' MSJ) Ex. 21, 24,
26.  The contract governing the Materials Recovery Facility, for instance, was formed in 2004.  *See id.* Ex. 21.

[11] Though there are eight designated facilities, two of them—the Clarkstown and French Farms Yard Waste
Facilities—are covered by the same contract.  *See* Certification of Andrew P. Foster (Pls.' MSJ) Ex. 68.

performance, the right to take corrective action if necessary, and the right to approve subcontractors.  *See, e.g.*, *id.* 21-22, 42.  The Authority set the "tipping fees"[12] charged to haulers depositing waste at the facilities and staffed the "scale houses" where in- and out-bound tonnage data is recorded.  Pls.' 56.1 Statement (Pls.' MSJ) ¶¶ 132-33; Defs.' 56.1 Response (Pls.' MSJ) ¶¶ 132-33.

The Authority paid the contractors a service fee, the formula for which was largely based on the amount of waste delivered to or from that facility (depending on the type of facility in question).  *See* Certification of Andrew P. Foster (Pls.' MSJ) Ex. 21, at 111-12; *id.* Ex. 24, at 37; *id.* Ex. 26, at 26-27; *id.* Ex. 53, at 26; *id.* Ex. 68, at 27-28; *id.* Ex. 69, at 31; *id.* Ex. 70, at 20-21. In certain instances, the contractor was also tasked with marketing and selling valuable materials recovered (or produced) at the facility.  *See, e.g.*, *id.* Ex. 21, at 76-80; *id.* Ex. 26, at 22-26.  The contractor would retain some or all of the sales revenue, but the Authority would recapture a percentage of that benefit in the form of an offset against the service fee otherwise owed to the contractor.  *See, e.g.*, *id.* Ex. 21, at 78, 113-115; *id.* Ex. 26, at 24, 28.

The Rockland County Department of Health ("DOH") was tasked with enforcing the Rockland Law.  Rockland Law § 350-4(A).  The Authority works closely with the DOH in this regard.  Pls.' 56.1 Statement (Pls.' MSJ) ¶ 226; Defs.' 56.1 Response (Pls.' MSJ) ¶ 226. Violators have included entities found to be transporting waste to or from Carbone's facility.  *See* Certification of Andrew P. Foster (Pls.' MSJ) Ex. 116.

---

[12] "Tipping fees are disposal charges levied against collectors who drop off waste at a processing facility.  They are called 'tipping' fees because garbage trucks literally tip their back end to dump out the carried waste."  *United Haulers*, 550 U.S. at 336 n.1.

**II.      The *Amici*'s Motion for Leave To Appear**

As a preliminary matter, the Court considers—and grants—the *Amici*'s motion for leave

to appear.

"There is no governing standard, rule or statute 'prescrib[ing] the procedure for obtaining

leave to file an *amicus* brief in the district court.'"  *Onondaga Indian Nation v. State*, No. 97-

CV-445, 1997 WL 369389, at *2 (N.D.N.Y. June 25, 1997) (alteration in original) (quoting

*United States v. Gotti*, 755 F. Supp. 1157, 1158 (E.D.N.Y. 1991)).  Resolution of a motion for

leave to file an *amicus* brief thus lies in the "firm discretion" of the district court.  *Lehman XS*

*Trust, Series 2006-GP2 v. Greenpoint Mortg. Funding, Inc.*, No. 12 CIV. 7935 ALC, 2014 WL

265784, at *1 (S.D.N.Y. Jan. 23, 2014) (citing *Jamaica Hosp. Med. Center, Inc. v. United Health*

*Group, Inc.*, 584 F. Supp. 2d 489, 497 (E.D.N.Y. 2008)).  In making the determination, courts

often rely on principles set out by the Seventh Circuit.  *See, e.g.*, *id.* at *2; *Auto. Club of N.Y.,*

*Inc. v. Port Auth. of N.Y & N.J.*, No. 11 CIV. 6746 RJH, 2011 WL 5865296, at *2 (S.D.N.Y.

Nov. 22, 2011); *Citizens Against Casino Gambling in Erie Cnty. v. Kempthorne*, 471 F. Supp. 2d

295, 311 (W.D.N.Y. 2007), *amended on reconsideration in part*, No. 06-CV-0001S, 2007 WL

1200473 (W.D.N.Y. Apr. 20, 2007).  The Seventh Circuit reasons as follows:

> An amicus brief should normally be allowed when a party is not represented
> competently or is not represented at all, when the amicus has an interest in some
> other case that may be affected by the decision in the present case (though not
> enough affected to entitle the amicus to intervene and become a party in the
> present case), or when the amicus has unique information or perspective that can
> help the court beyond the help that the lawyers for the parties are able to provide.
> Otherwise, leave to file an amicus curiae brief should be denied.

*Ryan v. Commodity Futures Trading Comm'n*, 125 F.3d 1062, 1063 (7th Cir. 1997) (citations

omitted).  A potential *amicus*'s partiality is a factor to be considered, but *amici* need not be

7

completely disinterested in the outcome of the litigation.  *See Auto. Club*, 2011 WL 5865296, at

*2 (quoting *Onondaga*, 1997 WL 369389, at *3).

  Although Plaintiffs are represented by competent counsel and some of the arguments

proffered in the proposed *amicus* brief are duplicative of those raised by Plaintiffs, the Court

nevertheless finds the *Amici*'s perspective to be helpful.  As will be discussed below, the

Rockland Law's treatment of recyclables is one of the main factors distinguishing this case from

prior flow control cases.  The *Amici* are national trade associations representing various interests

within the recyclable materials market.  *See Amicus* Br. at 1, 3-9.[13]  Having carefully reviewed

their brief and Defendants' objections thereto, *see* Defs.' Reply Mem. of Law in Further Supp.

(Defs.' MSJ) at 7-8, the Court is of the opinion that the *Amici*'s insights into the market for

recyclables, and their discussion of how this ordinance's treatment of recyclables differs from

those that have previously been examined, helps ensure that there has been "a complete and

plenary presentation of difficult issues so that the court may reach a proper decision."  *Gotti*, 755

F. Supp. at 1158.  While the *Amici* have not identified an interest in another case that may be

affected by the Court's ruling, it is fairly evident that the ultimate outcome of this litigation could

prove dispositive in future disputes over flow control ordinances that extend to recyclables.  A

full airing of the issues at stake is therefore particularly desirable in this instance, even taking

into account the *Amici*'s partiality.  The Court further finds that Defendants are not prejudiced by

the additional briefing, as the Court will simply ignore the *amicus* brief to the extent it rehashes

arguments that Plaintiffs raise directly.[14]  For all of these reasons, the *Amici*'s motion is granted.

---

[13] The *amicus* brief was filed as an attachment to the *Amici*'s motion for leave to appear.  Doc. 116-1.

[14] In any event, the Court's ruling on the merits of the summary judgment cross-motions should allay any concerns that Defendants have been prejudiced.

### III.    Cross-Motions for Summary Judgment:  Applicable Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might affect the outcome of the litigation under the governing law.  *Id.*

The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the burden of proof at trial would fall on the movant, that party's "own submissions in support of the motion must entitle it to judgment as a matter of law."  *Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 618 (2d Cir. 1998).  Conversely, "[w]hen the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."  *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) (citing *Celotex Corp.*, 477 U.S. at 322-23).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing *Celotex Corp.*, 477 U.S. at 322-23).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)) (internal

quotation marks omitted).  However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise.  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts."  *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation mark omitted).  To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor."  *Senno*, 812 F. Supp. 2d at 467-68 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986)).

The same legal standard applies when analyzing cross-motions for summary judgment. *See Schultz v. Stoner*, 308 F. Supp. 2d 289, 298 (S.D.N.Y. 2004) (quoting *Aviall, Inc. v. Ryder Sys., Inc.*, 913 F. Supp. 826, 828 (S.D.N.Y. 1996)).  "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."  *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citing *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 314 (2d Cir.1981)).  The Court is not required to grant summary judgment in favor of either moving party.  *See id.* (citing *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir.1993)).

## IV.   Discussion

### A.  Dormant Commerce Clause Jurisprudence

#### i.  General Principles

The Commerce Clause grants Congress the authority "[t]o regulate Commerce with foreign Nations, and among the several States."  U.S. Const. art. I, § 8, cl. 3.  "Although the Constitution does not in terms limit the power of States to regulate commerce, [the Supreme

Court has] long interpreted the Commerce Clause as an implicit restraint on state authority, even in the absence of a conflicting federal statute." *United Haulers*, 550 U.S. at 338.  This "implicit restraint" has come to be known as the "dormant" Commerce Clause.

In determining whether a state or municipal law violates the dormant Commerce Clause, courts must first analyze whether the law discriminates against interstate commerce.  *See Dep't of Revenue v. Davis*, 553 U.S. 328, 338 (2008).  The burden of proving discrimination lies with the party challenging the law.  *See USA Recycling, Inc. v. Town of Babylon*, 66 F.3d 1272, 1281 (2d Cir. 1995).  A law is discriminatory if it treats in- and out-of-state economic interests differently, such that in-state interests benefit and out-of-state interests are burdened.  *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994).  If the challenger successfully proves that a law is discriminatory, it will be struck down unless the state or municipality can demonstrate that the law "advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives."  *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 278 (1988); *see also Carbone I*, 511 U.S. at 392 ("Discrimination against interstate commerce in favor of local business or investment is *per se* invalid, save in a narrow class of cases in which the municipality can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest.").

If a statute survives this initial inquiry, it will be struck down only if "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits."  *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).  At this second stage of the analysis, the burden of proof again lies with the challenger.  *See USA Recycling*, 66 F.3d at 1281-82.  "For a state statute to run afoul of the *Pike* standard, the statute, at a minimum, must impose a burden on interstate commerce that is qualitatively or quantitatively different from that imposed on intrastate

11

commerce." *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 109 (2d Cir. 2001). Absent a disparate burden, it is unnecessary for a reviewing court to consider the statute's putative benefits at all. *Id.* If there is a disparate burden and the analysis proceeds, the court "should consider both 'the nature of the local interest involved, and . . . whether it could be promoted as well with a lesser impact on interstate activities.'" *SSC Corp. v. Town of Smithtown*, 66 F.3d 502, 510 (2d Cir. 1995) (alteration in original) (quoting *Pike*, 397 U.S. at 142).

### ii.  The Market Participant Exception

The dormant Commerce Clause prevents states from infringing on Congress's power to *regulate* interstate commerce. For state action to implicate the dormant Commerce Clause at all, therefore, that action must take the form of regulatory activity. *See SSC Corp.*, 66 F.3d at 510. "Some cases run a different course, however, and an exception covers States that go beyond regulation and themselves 'participat[e] in the market' so as to 'exercis[e] the right to favor [their] own citizens over others.'" *Davis*, 553 U.S. at 339 (alterations in original) (quoting *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 810 (1976)). Because "[t]here is no indication of a constitutional plan to limit the ability of the States themselves to operate freely in the free market," *Reeves, Inc. v. Stake*, 447 U.S. 429, 437 (1980), the dormant Commerce Clause analysis is inapplicable in such cases, and states are free to preference local interests. *See White v. Mass. Council of Constr. Emp'rs, Inc.*, 460 U.S. 204, 208 (1983) ("[W]hen a state or local government enters the market as a participant it is not subject to the restraints of the Commerce Clause."). Local governments may also act as market participants, so the exception applies with equal force to the market activities of localities. *See SSC Corp.* 66 F.3d at 510 n.18 (citing *White*, 460 U.S. 204).

### iii.  *Carbone I* and *United Haulers*

This case lies at the intersection of two Supreme Court precedents that explored the

constitutionality of municipal flow control ordinances under the dormant Commerce Clause.

First, in *Carbone I*, the Supreme Court struck down an ordinance that "require[d] all solid waste

to be processed at a designated transfer station before leaving the municipality."  511 U.S. at

386.  The designated facility was privately owned and operated (though there was an agreement

in place pursuant to which the town would purchase it after five years).  *Id.* at 387.[15]  Competing

companies—such as Carbone—could continue to receive solid waste, but they were required to

bring the nonrecyclable residue to the designated facility rather than shipping it themselves, thus

forcing them to pay a tipping fee on trash that they had already sorted.  *Id.* at 388.  In a string of

cases dating as far back as 1890, the Court had already reviewed—and struck down—various

local laws requiring that a particular resource (*e.g.*, timber, meat, or shrimp) be processed within

the state prior to sale or export.  *See id.* at 391-92 (collecting cases).  According to the majority,

the "only conceivable distinction" between those cases and *Carbone I* was that, in *Carbone I*,

only a single in-state interest benefitted from the challenged law.  *Id.* at 392.  The Court

nevertheless determined that the ordinance was "just one more instance of local processing

requirements that we long have held invalid."  *Id.* at 391.  By "hoard[ing] solid waste, and the

---

[15] *Carbone I* involved a local flow control ordinance adopted by the Town of Clarkstown, a town within Rockland
County.  At the time, the favored processing facility—the same Clarkstown Transfer Station that is among the eight
facilities the Authority designated under the Rockland Law—was owned and operated by Carbone's competitor,
Clarkstown Recycling Center, Inc. ("CRC").  Pls.' 56.1 Statement (Pls.' MSJ) ¶¶ 25-26, 115; Defs.' 56.1 Response
(Pls.' MSJ) ¶¶ 25-26, 115.  CRC now serves as the Authority's private contractor for that facility, which the
Authority purchased from the Town of Clarkstown in November 2008.  *See* Certification of Andrew P. Foster (Pls.'
MSJ) Ex. 69, at 1.  (Clarkstown had acquired the transfer station from CRC pursuant to the purchase agreement
described in the body of this Opinion.)  At the time of the sale, Clarkstown assigned to the Authority a pre-existing
agreement with CRC.  *See id.*  That agreement was subsequently amended and restated to create the contract
currently in place with respect to the facility.  *See id.*

demand to get rid of it, for the benefit of the preferred processing facility," the ordinance unlawfully discriminated against interstate commerce.  *Id.* at 392.

Over a decade later, in *United Haulers*, the Supreme Court upheld two flow control ordinances that were "quite similar" to the one struck down in *Carbone I*.  550 U.S. at 334.  "The only salient difference [was] that the laws at issue [in *United Haulers*] require[d] haulers to bring waste to facilities owned and operated by a state-created public benefit corporation."  *Id.*  The Court determined that this difference was "constitutionally significant," concluding that trash disposal "has been a traditional government activity for years, and laws that favor the government in such areas—but treat every private business, whether in-state or out-of-state, exactly the same—do not discriminate against interstate commerce for purposes of the Commerce Clause."  *Id.*  In other words, since the ordinances challenged in *United Haulers* hoarded waste solely for the benefit of a "clearly public facility," they survived the first phase of dormant Commerce Clause scrutiny.  *Id.* at 341.  Four Justices went on to uphold the law under *Pike*, *id.* at 346-47, while Justice Scalia wrote separately to express his view that *Pike* balancing should be abandoned altogether, as it represents a task better left to Congress.  *Id.* at 347-49 (Scalia, J., concurring) (observing that deferral of such balancing determinations to Congress "is precisely what the Commerce Clause (the *real* Commerce Clause) envisions" (emphasis in original)).

In Plaintiffs' view, the Rockland Law, as applied, resembles the flow control ordinance struck down in *Carbone I* and is therefore unconstitutional.  Defendants, on the other hand, see their flow control regime as mirroring the ones that were upheld in *United Haulers*.  They therefore argue that the outcome of the dormant Commerce Clause analysis is effectively compelled by the Supreme Court's decision in that case.   As the balance of this opinion

explains, the answer lies somewhere in between, but the ordinance survives constitutional scrutiny nevertheless.

### B.  The Rockland Law Is Constitutional As Applied

#### i.  The Rockland Law Does Not Discriminate Against Interstate Commerce

The Court begins by asking whether the Rockland Law, as applied,[16] unlawfully discriminates against interstate commerce.[17]  The fundamental disagreement among the parties is over whether the *United Haulers* exception requires both public ownership *and* public operation of designated facilities, or whether public ownership alone is sufficient.  The parties also disagree as to whether the designated facilities in this case are, in fact, publicly or privately operated.  The outcome of these disputes are immaterial for present purposes, however, because the law within this Circuit compels the conclusion that public ownership alone suffices for purposes of the first phase of dormant Commerce Clause analysis.

The Second Circuit's opinion at an earlier stage in the *United Haulers* litigation turned entirely on the public ownership of the designated facilities in that case, finding ownership to be "determinative" for purposes of distinguishing those flow control ordinances from the one the

---

[16] At an earlier stage in these proceedings, the Court observed that the flow control ordinance would survive a facial challenge.  *C&A Carbone, Inc. v. Cnty. of Rockland*, No. 08-CV-6459 (KMK), 2010 WL 3825740, at *6 (S.D.N.Y. Sept. 30, 2010) ("[T]he 2008 Flow Control Law is not unconstitutional on its face.  Indeed, the Authority might have only designated publicly-owned and operated facilities, thereby bringing the law squarely within the *United Haulers* exception.").

[17] Defendants' activity in enacting flow control legislation and designating the eight facilities is clearly regulatory in nature, as "no private actor could engage in such activity."  *USA Recycling*, 66 F.3d at 1282.  The market participation exception is thus inapplicable for purposes of analyzing these activities.  As will be discussed *infra* Section IV.C, Defendants did engage in market activity when they retained private contractors; however, that alone does not convert the County's entire flow control regime into market participation.  *See id.* ("[S]tates and local governments do not enjoy *carte blanche* to regulate a market simply because they also participate in that market." (citing *SSC Corp.*, 66 F.3d at 513)).

15

Supreme Court struck down in *Carbone I*. *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 261 F.3d 245, 258 (2d Cir. 2001) ("*United Haulers I*"). Speaking solely in terms of public ownership throughout its opinion, the Court of Appeals upheld the Oneida-Herkimer Laws on the grounds that they "negatively impact[ed] all private businesses alike, regardless of whether in-state or out-of-state, in favor of a publicly owned facility." *Id.* at 263. The Court finds this emphasis on public ownership significant given that, at the time of the Second Circuit's decision, one of the five designated facilities was privately operated.[18] *See id.* at 250-51. Plaintiffs do not dispute this fact, instead merely noting that the facts had changed such that none of the designated facilities was privately operated by the time the case returned to the Second Circuit five years later. *See* Pls.' Reply Br. (Pls.' MSJ) at 1-2; *see also United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 438 F.3d 150, 153 (2d Cir. 2006) ("*United Haulers II*") (indicating that all designated facilities at issue were "owned and operated by a public corporation").[19] It was only after that second trip to the Court of Appeals that the case found its way to the Supreme Court. Thus, by the time the Supreme Court

---

[18] It bears noting that the privately operated facility was being run by an out-of-state company, so the facts of the present case are distinguishable on that basis. *See United Haulers I*, 261 F.3d at 250. However, because the Second Circuit was keenly aware of the potential for "out-sourcing" of operational responsibilities, *id.* at 251, the Circuit's exclusive focus on public ownership cannot be written off on that basis alone. In other words, the *United Haulers I* court could have held that, although one of the designated facilities was privately operated, the flow control ordinances were nondiscriminatory because no preference was shown for *in-state* private interests. But that is not what the court did. Instead, after dedicating a four-paragraph subsection of its factual recitation to a discussion of the privately operated facility, *id.* at 250-51, the Court still went on to conclude that *all* private businesses, both in- *and* out-of-state, suffered the same negative impact.

[19] The case returned to the Second Circuit, following remand to the Northern District of New York, solely on the issue of *Pike* balancing, which the Court of Appeals had declined to reach in the first instance. *See United Haulers II*, 438 F.3d at 155-56. The second opinion therefore did not revisit the merits of the first.

As noted parenthetically in the main text, citations to "*United Haulers I*" refer to the Second Circuit's 2001 decision, while citations to "*United Haulers II*" refer to the Second Circuit's 2006 decision. Citations to "*United Haulers*" (without a numeric designation) refer to the Supreme Court decision that followed in 2007.

considered the issue, the facts had changed sufficiently that the majority was able to identify both public ownership and operation as the "constitutionally significant" distinction from *Carbone I*. But nothing in the High Court's opinion suggests that it was *reversing* the Second Circuit to the extent its 2001 opinion (*United Haulers I*) had articulated a broader principle—namely, that public ownership alone was sufficient to render a flow control ordinance nondiscriminatory. That broader issue was simply not before the Supreme Court, so there was no need for the majority to reach it at all.  The fact that the Court arguably premised its affirmance on narrower grounds, therefore, does not necessarily imply that it would not have issued a more general affirmance had the facts not changed after 2001.

In other words, there is no basis for a conclusion that the Second Circuit's decision in *United Haulers I* no longer represents good law—and binding authority—within this Circuit.  A contrary view would require the Court to draw a negative inference from the *absence* of a private-operation issue in the facts presented to the Supreme Court.  This Court is unwilling to draw such an inference, particularly given Plaintiffs' acknowledgment that the Supreme Court did, in fact, receive briefing and hear oral argument on the question of public versus private operation.  *See* Pls.' Reply Br. (Pls.' MSJ) at 2 & nn.4-5.  Had the Supreme Court sought to vacate a portion of the Second Circuit's 2001 opinion, it presumably would have done so expressly.  Absent contrary guidance from the Supreme Court or from the Second Circuit, the Court of Appeals' holding therefore remains binding on this Court.

In this case, the undisputed facts make clear that all eight designated facilities are publicly owned.[20]  As such, because the benefits of the flow control ordinance accrue solely to

---

[20] Plaintiffs note that "[t]he reality is more nuanced" in that one of the eight facilities is not located on publicly owned land and some of the private contractors provide their own equipment.  *See* Pls.' Br. in Supp. (Pls.' MSJ) at 8

the locality, there is no differential treatment of either in- or out-of-state private entities.  The Authority's selection of the eight designated facilities therefore does not discriminate against interstate commerce, and the Rockland Law survives the first phase of dormant Commerce Clause scrutiny.

### ii.  The Rockland Law Is Not Excessively Burdensome

Having determined that the Rockland Law does not discriminate against interstate commerce, the Court turns to the second stage of the dormant Commerce Clause inquiry:  *Pike* balancing.  Here, again, Plaintiffs have failed to meet their burden of proving that any incidental burden on interstate commerce is clearly excessive in relation to the ordinance's putative benefits.

As discussed above, the first step in the *Pike* inquiry involves a determination as to whether a nondiscriminatory ordinance imposes any disparate burden on interstate commerce.  To date, the Second Circuit has recognized three situations in which such a burden may be found to exist:  "(1) when the regulation has a disparate impact on any non-local commercial entity; (2) when the statute regulates commercial activity that takes place wholly beyond the state's borders; and (3) when the challenged statute imposes a regulatory requirement inconsistent with

---

n.4; *see also* Certification of Andrew P. Foster (Pls.' MSJ) Ex. 58, at RC614 (referencing private ownership of the land on which the Clarkstown Concrete & Asphalt Crushing Facility is located); *id.* Ex. 69, at 18-19 (exemplifying a contract pursuant to which the contractor was required to provide the necessary "rolling stock" [bulldozers, trucks, etc.] for at least a portion of the contract period).  The Court views this nuance as immaterial for present purposes, as the references to "facilities" in both *Carbone I* and the various *United Haulers* opinions are clearly focused on ownership of the buildings to which the waste is directed.  Fee title to the land, and ownership rights in the equipment, do not affect the analysis with respect to whether the local government, as opposed to a private entity, is benefitting from the flow control ordinance's hoarding of waste.  Moreover, although Plaintiffs flag the ownership issue, they never affirmatively challenge the Rockland Law's constitutionality on that basis.  *See* Pls.' Br. in Opp'n (Defs.' MSJ) at 4 n.2 (indicating that the public ownership point is "factually overstated, but unnecessary to debate").

those of other states." *United Haulers II*, 438 F.3d at 156-57.  The Second Circuit has not, however, held this to be an exhaustive list.  *Id.* at 157.

Nothing in the record, or in Plaintiffs' papers, suggests that the latter two considerations are at issue in this case.  With respect to the first—disparate impact on non-local commercial entities—this avenue has been foreclosed by the Second Circuit's decision in *United Haulers I*. As noted above, the court in that case concluded that the Oneida-Herkimer Laws—which at the time provided for private operation of one of the designated facilities—"negatively impact[ed] all private businesses alike" by favoring publicly owned facilities.  *United Haulers I*, 261 F.3d at 263.  Thus, even assuming, *arguendo*, that the Authority's contractual relationships with private entities created a private operation issue in the case at bar, that alone would not provide a basis for finding a disparate impact on non-local entities.[21]

The basis for Plaintiffs' *Pike* argument is not immediately apparent, as their opening brief asserts in conclusory fashion that the flow control ordinance "directly and significantly burdens interstate commerce."  Pls.' Br. in Supp. (Pls.' MSJ) at 26.  The only support for this general allegation is a cross-reference to a portion of Plaintiffs' Local Rule 56.1 Statement describing various instances in which the ordinance has been enforced against violators.  *See id.*; Pls.' 56.1 Statement (Pls.' MSJ) ¶¶ 219-56.  But the mere fact that a statute is enforced against companies that violate its terms does not render the statute itself disparately burdensome, regardless of whether the violators were attempting to engage in interstate commerce.

---

[21] Plaintiffs' expert discusses various ways in which flow control burdens interstate commerce, but the expert report does not focus on how, if at all, such burdens are disproportionately borne by non-local economic interests.  *See* Certification of Andrew P. Foster (Pls.' MSJ) Ex. 2, at 27-39.  For instance, Plaintiffs' expert writes that "[h]aulers collecting solid waste and recyclables from different regions are obliged to segregate it by county of origin and unload it at different locations in order to abide by Rockland County's Flow Control Law." *Id.* at 28.  Be that as it may, this burden would seemingly be shared by all regional haulers collecting waste in Rockland County, regardless of whether they are based within or outside New York.

The *Amici*, for their part, cite to Justice O'Connor's concurrence in *Carbone I*, suggesting that the Rockland Law is flawed insofar as it cuts off Rockland County from the interstate market.  *See Amicus* Br. at 11-12.  Justice O'Connor declined to adopt the *Carbone I* majority's view that favoritism of a single, privately owned and operated local facility discriminates against interstate commerce, instead concluding that the flow control regime in that case failed *Pike*.  *See Carbone I*, 511 U.S. at 404-407 (O'Connor, J., concurring).  She cautioned that, if other jurisdictions enacted similar laws, "pervasive flow control would result in the type of balkanization the [Commerce] Clause is primarily intended to prevent."  *Id.* at 406.  The Second Circuit has previously considered this generalized criticism of flow control, declining to decide whether it represents a cognizable burden because, even if it does, that burden would be "modest."  *United Haulers II*, 438 F.3d at 160.  As the court explained:

> If a municipal government may *eliminate* the local private market for waste disposal services, we think it necessarily follows that a local government imposes no more than a limited burden on interstate commerce when it creates a partial monopoly with respect to solid waste management—here, at the processing stage—that has the ancillary effect of diminishing interstate commerce in that same market.
>
> Plaintiffs' argument that economic "balkanization" would result if jurisdictions across the country were to adopt a similar flow control scheme fails for similar reasons.  It is unquestionably the case that the interstate market for waste disposal services would suffer if numerous jurisdictions were to impose restrictions like these on private entities that engage in trash collection.  But it is difficult to muster much alarm about that result when, for at least one hundred years, this nation has allowed municipalities to exercise the greater power of taking exclusive control of all locally generated solid waste from the moment that it is placed on the curb.

*Id.* at 161 (emphasis in original).[22]  Rather than deciding whether these supposed burdens were cognizable at all for purposes of *Pike*, the court took the analysis out of its typical order and determined that, even if there was a "modest" burden, that burden was outweighed by the ordinances' benefits.  *Id.* at 160-63.  The Court will follow the Second Circuit's lead for purposes of the instant motions.  In other words, although Plaintiffs have arguably failed to come forward with evidence of any disparate burden on interstate commerce, the Court will nevertheless proceed to examine the putative benefits of the Rockland Law and weigh those benefits against any incidental burden created by the Authority-imposed monopoly.

"Our conclusion that the assumed burden created by the [Rockland Law] is slight means that [Defendants] need to present only a minimal showing of local benefit in order to compel a finding that this burden is not 'clearly excessive' to the benefits that the ordinances provide."  *Id.*  An examination of the record reveals that the ordinance's putative benefits survive this relatively low level of scrutiny.  The Rockland Law itself includes a legislative intent section detailing the objectives it seeks to achieve.  *See* Rockland Law § 350-1.  One such goal is to facilitate the implementation of waste management options "such as source reduction, resource recovery, and alternative solid waste processing technologies" that would not otherwise be "economically appealing" to the private market.  *Id.* § 350-1(B).  The hope is to increase the recycling rate and decrease the amount of waste deposited in landfills.  *Id.* § 350-1(C).  The law further indicates that flow control will "serve important environmental and public health, welfare, and safety objectives."  *Id.*

---

[22] In conducting their own *Pike* analyses with respect to flow control legislation, two other district courts have recently rejected arguments about the potential cumulative burden that would be imposed on interstate commerce if additional jurisdictions were to implement similar flow control legislation.  *See Southern Waste Systems, LLC v. City of Coral Springs*, 687 F. Supp. 2d 1342, 1369 (S.D. Fla. 2010); *Quality Compliance Services, Inc. v. Dougherty County*, 553 F. Supp. 2d 1374, 1379-81 (M.D. Ga. 2008).

The record supports Plaintiffs' contention that at least some of these goals could have been pursued via other means, but only to an extent.  For example, pre-existing Rockland County laws and inter-municipal agreements already provided that all residential recyclables were to be delivered to the Authority-owned Materials Recovery Facility[23] and that both residential and commercial recyclables had to be "source-separated" (*i.e.*, separated from other types of waste by the person or entity responsible for generating that waste).  *See* Certification of Andrew P. Foster (Pls.' MSJ) Ex. 2, at 6, 41-42; *id.* Ex. 9, at 69:10-72-21; *id.* Ex. 48, at 59:18-23.[24] Plaintiffs ask the Court to conclude that Defendants could have simply stepped-up enforcement of those pre-existing laws.  *See* Pls.' Br. in Supp. (Pls.' MSJ) at 25.  While the Court does not doubt that Defendants could have attempted to do so, it seems self-evident that, as was the case in *United Haulers*, flow control enables more efficient and more effective enforcement of waste-management laws.  *See United Haulers*, 550 U.S. at 347 ("If the haulers could take waste to any disposal site, achieving an equal level of enforcement would be much more costly, if not impossible.").  In other words, if the Authority's facilities are receiving and processing all waste generated within the County, it necessarily becomes more difficult for private waste generators to avoid detection of their non-compliance with source-separation requirements.  Thus, because *Pike* asks courts to consider not merely the existence of alternative means of promoting a local benefit, but also whether those alternatives would be as effective, the Court concludes that

---

[23] As noted *supra* note 10, the Authority's ownership of the Materials Recovery Facility—and its agreement with the private contractor for that facility—predates both the Supreme Court's *United Haulers* decision and passage of the Rockland Law.  *See* Certification of Andrew P. Foster (Pls.' MSJ) Ex. 21, at 1 (indicating that the Authority already owned the Materials Recovery Facility when it engaged the private contractor in June 2004).

[24] The Court views the pre-existing agreements directing all residential recyclables to the Authority's facility to be a neutral fact, as the lack of any additional benefit to the County is offset by a lack of any additional burden on interstate commerce.

fostering the increase of the recycling rate remains a cognizable local benefit of the Rockland

Law.  *See Pike*, 397 U.S. at 142 ("[T]he extent of the burden that will be tolerated will of course

depend on the nature of the local interest involved, and on whether it could be promoted *as well*

with a lesser impact on interstate activities." (emphasis added)).[25]

    Plaintiffs and Plaintiffs' expert contend that none of the purported benefits of flow

control were actually realized.  *See* Certification of Andrew P. Foster (Pls.' MSJ) Ex. 2, at 40-51.

Plaintiffs' expert also challenges the assumptions underlying some of the data the Authority

relied on in deciding to implement flow control.  *Id.*  However, as the Second Circuit has

explained, *Pike* "does not invite courts to second-guess legislatures by estimating the probable

costs and benefits of the statute."  *Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d 200,

209 (2d Cir. 2003).  The Court therefore declines Plaintiffs' invitation to hold the Rockland Law

unconstitutional merely because it might have turned out to be bad policy.  To do so would be to

suggest that a law's constitutionality depends on its ultimate efficacy, such that one law is

constitutional because it achieved its legislative objectives, while an otherwise-identical law is

unconstitutional because it failed to do so.[26]  Moreover, Defendants have provided testimony as

---

[25] The record also indicates that, prior to enacting the Rockland Law, members of the County legislature considered a financial analysis, prepared by the Authority's consulting engineer, that projected that the law would generate additional revenue.  *See* Pls.' 56.1 Statement (Pls.' MSJ) ¶¶ 84-86; Defs.' 56.1 Response (Pls.' MSJ) ¶¶ 84-86.  In *United Haulers*, a plurality ruled that revenue generation is "a cognizable benefit for purposes of the *Pike* test."  550 U.S. at 346.  However, as Plaintiffs point out, this objective is one that could fairly readily be pursued via other means.  *See* Pls.' Br. in Supp. (Pls.' MSJ) at 26; *see also United Haulers II*, 438 F.3d at 162 (noting that some of the stated goals of the Oneida-Herkimer Laws, "*particularly those relating to revenue generation*, also might be achieved through other instruments of municipal policy" (emphasis added)).  Thus, while the Court does not ignore revenue generation entirely, it affords it only limited weight in balancing the Rockland Law's benefits and burdens.

[26] Indeed, Plaintiffs' approach would suggest that an individual law's constitutionality could depend on the point in time at which a dormant Commerce Clause challenge is brought:  a law that succeeds from a policy perspective in year one would be constitutional if challenged at that point, while the same law, if unsuccessful in subsequent years, would be unconstitutional if challenged at that later point.  This type of *ex post* reasoning cannot form the basis for sound constitutional analysis.

to certain ways in which flow control has proven beneficial.  *See* Decl. of Anna M. Roppolo (Defs.' MSJ) ¶¶ 16-18 (describing how the Authority is able to collect various types of recyclables despite volatility and marketability issues that exist in the private market for such goods, and discussing the benefits of having predictable volumes of waste delivered to Authority facilities).

The Court grants, based on the evidence in the record, that this is a close case under *Pike*. But it is Plaintiffs who bear the burden of proving that any incidental burdens imposed on interstate commerce are clearly excessive in relation to the putative local benefits.  A close case, therefore, results in the ordinance being upheld.  Here, the Court of Appeals has made clear that any purported incidental burden on interstate commerce is relatively minor.  While the record suggests that the Rockland Law was perhaps not as beneficial as the Authority and the County had hoped it would be, Defendants have identified at least some non-illusory local benefits.  The Court also bears in mind the Second Circuit's admonition that "the fact that a municipality is acting within its traditional purview must factor into the district court's determination of whether the local interests are substantially outweighed by the burdens on interstate commerce."  *United Haulers I*, 261 F.3d at 264.  Since waste management has long been identified as a traditional government function, that consideration comes into play here.  The Court therefore finds that, to the extent the Rockland Law incidentally burdens interstate commerce, those burdens are not clearly excessive in relation to the putative benefits.

### iii.  The Rockland Law's Treatment of Recyclables Does Not Render the Law Unconstitutional

One key distinction Plaintiffs attempt to draw between the Rockland Law and the flow control ordinances at issue in *United Haulers* is that the Rockland Law exerts a broader reach

24

over the regulation of recyclables.[27]  Plaintiffs are correct in this regard, and the distinction

arguably provides one of Plaintiffs' strongest arguments in favor of finding a dormant

Commerce Clause violation.  Ultimately, however, the argument fails to provide a sufficient

basis for striking down the ordinance.

 While both the Rockland Law and the Oneida Law facially appear to regulate the

disposal of all designated recyclable materials generated in the respective counties, *see* Rockland

Law §§ 350-5(A)-(B); Oneida Law § 2(a),[28] the Oneida Law contain an express exemption

permitting persons who wish to donate or sell their recyclables to do so as long as those

recyclables are not placed curbside.  *See* Oneida Law § 2(d).   The Herkimer Law omits the

catchall provision but nevertheless contains the language expressly permitting sale or donation.

*See* Herkimer Law § 2(c).[29]  The Rockland Law does not include this broad-based exception for

recyclables, instead granting the Authority discretion to write regulations allowing exceptions if

certain criteria are satisfied.  *See* Rockland Law § 350-11(C); Authority Regulations at Rule 6.[30]

These exemptions are available only to commercial entities.  *See* Rockland Law § 350-11(C).

 Plaintiffs argue that disposal of recyclables is not a traditional government function and

refer the Court to expert and industry reports in support of this proposition.  *See* Pls.' Br. in

---

[27] This portion of Plaintiffs' argument more closely resembles a facial (as opposed to an as-applied) challenge to the Rockland Law's constitutionality.  However, because the parties do not draw this distinction, which for practical purposes is a matter of technical precision that will not affect the substance of the legal analysis, the Court continues to refer to Plaintiffs' case as an as-applied challenge.

[28] A copy of the Oneida Law is attached as Exhibit 5 to the Declaration of Peter Adelman in opposition to Plaintiffs' motion for summary judgment.  Doc. 117.

[29] A copy of the Herkimer Law is attached as Exhibit 6 to the Declaration of Peter Adelman in opposition to Plaintiffs' motion for summary judgment.  Doc. 117.

[30] A copy of the Regulations promulgated by the Authority is attached as Exhibit 3 to the Declaration of Peter Adelman in support of Defendants' motion for summary judgment.  Doc. 98.

Supp. (Pls.' MSJ) at 24-25.   The problem, however, is that Plaintiffs' argument seemingly overlooks the fact that, as discussed, there was at least some regulation of recyclables in *United Haulers*—albeit only once those recyclables were placed curbside—and yet the Supreme Court still unequivocally held that the counties in that case were engaged in traditional governmental activity.  In other words, when discussing local government's role in providing waste management services, the Supreme Court at no point stopped to distinguish recyclable materials as a separate category of waste.  Granted, the Court's silence on this point is not necessarily determinative.  Nevertheless, this Court is loath to engage in judicial line-drawing exercises, wherein the constitutionality of a flow control ordinance hinges on the stage in the process at which recyclables are deemed to have entered the realm of traditional government activity.[31] Because the Court has already determined that the flow control regime as a whole hoards waste in favor of the locality, and not in favor of any in-state private interests, the Court concludes that the ordinance's treatment of recyclables—while arguably rendering this a closer case—is not a constitutionally significant departure from the laws upheld in *United Haulers*.

Therefore, because the Rockland Law, as applied, is neither *per se* discriminatory nor excessively burdensome, the flow control ordinance survives Plaintiffs' dormant Commerce Clause challenge.

---

[31] The Court notes that, to the extent that the *Amici*'s argument is rooted in the notion that recyclables are effectively being forced into the stream of commerce, the *Amici* are actually describing what sounds more like a Takings Clause objection to the Rockland Law.  *See Amicus* Br. at 13-14 ("Defendant's law sweeps all recyclables into the same category as traditional garbage, giving no recognition to the fact that it is property and is often sold for value."). Given that the first two complaints in this action included express Takings claims, but that those causes of action were dropped from the subsequent pleadings, the Court is unwilling at this point to reincorporate them via the *Amici*'s argument in support of the dormant Commerce Clause claim.  *See* Compl. ¶ 42; Second Am. Compl. ¶¶ 102-106.

**C.  The Authority's Use of Private Contractors Falls Within the Market Participant Exception**

The Court must also examine whether the Authority's use of private contractors—and, more specifically, its alleged preference for in-state economic interests—in itself offends the dormant Commerce Clause.  The Court concludes that it does not.

"Courts must evaluate separately each challenged activity of the state to determine whether it constitutes participation or regulation."  *USA Recycling*, 66 F.3d at 1283.  Thus, although the Authority's application of the flow control ordinance itself passes constitutional muster, that inquiry is not dispositive to the extent Plaintiffs also challenge the Authority's delegation of certain operational responsibilities to private contractors.  This challenge fails because, in entering into contracts with private entities, the Authority is acting as a market participant.  Consequently, the dormant Commerce Clause does not apply, and any preference that the Authority may have shown for in-state operators is shielded from constitutional scrutiny.  Once again, binding Second Circuit authority compels the outcome.

In *USA Recycling*, the Court of Appeals reviewed a system pursuant to which the Town of Babylon took over the commercial garbage collection market, rendering itself the sole provider of garbage collection services.  *See id.* at 1282.  Simultaneously, the Town granted one local garbage hauler an exclusive license to collect commercial garbage.  *See id.* at 1279.  The plaintiffs brought a dormant Commerce Clause challenge, essentially "argu[ing] that the Town's exclusion of private garbage haulers and the hiring of a single garbage hauler . . . is nothing more than a crude facade for a flow control ordinance like the one struck down by the Supreme Court in *Carbone [I]*."  *Id.* at 1283.  The Second Circuit found the Town's takeover of the commercial garbage market to be unobjectionable, distinguishing it from *Carbone I* on the grounds that "the

27

payment of taxes in return for municipal services is not comparable to a forced business transaction that the [ordinance] in *Carbone* . . . required, and that rendered [that ordinance] discriminatory against interstate commerce." *Id.*  Having so found, the court went on to explain that the Town's utilization of a private contractor to provide municipal services on its behalf was "quite unremarkable." *Id.* at 1284 ("While the law may distinguish between activities performed by the Town itself and those performed by independent contractors for purposes of tort liability or agency law, plaintiffs offer no authority for the proposition that these distinctions have any constitutional significance.").  In other words, the fact that the Town's takeover of the market was paired with a contractual delegation of its consequent duties was irrelevant to the dormant Commerce Clause analysis; the latter did not bear on the constitutionality of the former.  Instead, the Second Circuit undertook an independent analysis of the contractual relationship, concluding that the Town's decision to outsource its garbage collection obligations was shielded by the market participant exception.  *See id.* at 1289 ("[A]llegations that the Town favored [a single local garbage hauler] are irrelevant because the market participation doctrine permits the Town to hire whatever company it chooses, on whatever terms it chooses, to provide municipal services.").

The key distinction between *USA Recycling* and this case is that here the local government is requiring garbage haulers to enter into forced business transactions, in that the requirement that waste be delivered only to Authority-designated facilities carries with it an obligation to pay the tipping fees set by the Authority.  However, as discussed, the Second Circuit has sanctioned this particular type of forced business transaction—that is, a forced transaction that hoards waste for the benefit of a publicly owned facility—as long as *Pike* is satisfied.  In the Court's view, once this first-order inquiry is resolved in Defendants' favor, there

is no reason why the *USA Recycling* holding with regard to private contractors should apply with any less force. The Court therefore finds that, in retaining private contractors to handle certain operational responsibilities at its facilities, the Authority was acting as a market participant. *Cf. id.* at 1282 (indicating that a local government acts as a market regulator rather than a market participant when it engages in activities that private actors cannot undertake). As such, any allegations of improper favoritism lack constitutional significance, as the Authority was free to preference local interests without running afoul of the dormant Commerce Clause.

## V.   Conclusion

For the reasons set forth above, Plaintiffs' motion for summary judgment is DENIED, and Defendants' motion for summary judgment is GRANTED. The *Amici*'s motion for leave to appear is GRANTED. The Clerk of the Court is respectfully directed to terminate the motions (Docs. 96, 100, 116) and to close this case.

It is SO ORDERED.

Dated:   March 24, 2014
         New York, New York

_____
Edgardo Ramos, U.S.D.J.